**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
SOUTHWESTERN DIVISION**

| | |
|---|---|
| William Jude Hart, ) | |
| ) | |
| Plaintiff, ) | |
| ) | **ORDER GRANTING DEFENDANTS'** |
| vs. ) | **MOTION FOR SUMMARY JUDGMENT** |
| ) | |
| Leann K. Bertsch, Timothy Schuetzle, ) | |
| Kathy Bachmeier, in their individual and ) | Case No. 1:06-cv-080 |
| official capacities, ) | |
| ) | |
| Defendants. ) | |

Before the Court is the Defendants' Motion for Summary Judgment filed on October 31, 2007. A response to the Defendants' motion was filed on November 30, 2007. For the reasons set forth below, the Defendants' motion is granted.

**I.    BACKGROUND**

On October 16, 2006, the plaintiff, William Hart, an inmate in the custody of the North Dakota Department of Corrections and Rehabilitation, initiated this lawsuit alleging violations of his constitutional right to receive necessary medical care in violation of 42 U.S.C. § 1983. Hart contends that the Defendants have failed to provide adequate medical care for his serious medical needs in that he has been housed in a cell that utilizes "steam heat," and the Defendants have not provided him a medical alert button which he contends is necessary because he has sleep apnea. Hart seeks to be moved to "an area that has forced air heat and a medical alert button." See Docket No. 6, ¶ VI. Hart also seeks $250,000 in punitive damages.

Hart concedes that the Defendants' statement of the case is accurate with two exceptions - that he was never uncooperative and that he did not ask to be housed in a particular unit of the North Dakota State Penitentiary. See Docket No. 21. As such, the following facts are not in dispute.

Hart has been housed at the North Dakota State Penitentiary in Bismarck, North Dakota, at all times relevant to this action. See Affidavit of Timothy Schuetzle, Docket No. 17. From 1999 to December 2005, Hart was housed in the South Unit of the penitentiary. The South Unit is a newer unit and is considered preferred housing. To reside in the South Unit, an inmate must satisfy certain criteria including having no major infraction reports for six months prior to application.

On November 30, 2005, an incident report was filed against Hart for disorderly conduct and disobeying a verbal order, both Class A violations. Hart was found guilty of both violations and the findings were upheld on appeal. As a result, Hart lost his preferred housing status in the South Unit and he was transferred to the East Cell House.

On January 31, 2006, Hart was seen by Dr. John J. Hagan, a physician at the North Dakota State Penitentiary, for complaints of chest pain and shortness of breath. See Affidavit of Dr. Hagan, Docket No. 18. Dr. Hagan's physical examination revealed normal cardiac rate and rhythm and normal lung sounds. Dr. Hagan ordered numerous tests to attempt to determine the cause of the chest pain. Hart was fitted with a holter monitor, a portable ambulatory electrocardiography device for monitoring the electrical activity of the heart for 24 hours or more. The results from the holter monitor were reviewed by Dr. Ivaldo Lunardi of Medcenter One, who prepared a report concluding that there was no correlation between Hart's complaints of shortness of breath or chest pains and any heart activity. Dr. Hagan also ordered a CAT scan and a stress test, and the results of both tests were normal, although the stress test revealed that Hart had a poor exercise tolerance.

Dr. Hagan saw Hart on February 27, 2006, to discuss the results of the holter monitor and to check his blood pressure. On March 10, 2006, Dr. Hagan requested a meeting with Hart to discuss the results of the stress test. On March 16, 2006, Dr. Hagan met with Hart to discuss the test results, and also examined Hart and diagnosed Hart with an upper respiratory infection. Based on his review of the cardiac tests, Dr. Hagan concluded that Hart's shortness of breath and chest pain complaints were more likely associated with pulmonary insufficiency and limited oxygen delivery rather than coronary artery disease.

Dr. Hagan then ordered pulmonary function tests in preparation for Hart to see a pulmonologist. On March 16, 206, Dr. Hagan wrote Dr. Andreas Sarrigiannidis, a physician with Medcenter One in Bismarck, North Dakota, to give Dr. Sarrigiannidis background testing information on Hart. Hart was scheduled to have the pulmonary function tests on April 7, 2006, after which he was to see Dr. Sarrigiannidis. The pulmonary function tests were performed on April 7, 2006, but Hart was unable to review the results with Dr. Sarrigiannidis until April 28, 2006, because of Dr. Sarrigiannidis' unavailability. Dr. Sarrigiannidis' report indicated that there were no specific findings, but identified the possibility of sleep apnea based on Hart's symptoms. Dr. Sarrigiannidis recommended an overnight polysomnography to rule out sleep apnea.

Prior to the polysomnography test, Hart wrote Dr. Sarrigiannidis and requested that Dr. Sarrigiannidis intervene and have him placed in the South Unit to avoid the "steam heat" in the East Cell House were he was lodged. See Docket No. 18, p. 35. Dr. Sarrigiannidis recommended that Hart avoid "steam heat" but advised Hart that he had no authority to affect housing decisions in the prison system. Hart contends that Dr. Sarrigiannidis told both himself and correctional officer Pudwell that steam heat would deteriorate his pulmonary condition and that Hart should not be

3

housed in steam heat. Hart contends that Pudwell verbally informed a nurse at the penitentiary of this upon their return from Dr. Sarrigiannidis's office. Dr. Sarrigiannidis' letter did not recommend or even mention that Hart needed access to a medical alert button.

Hart's polysomnography took place on June 20, 2006. Based on the polysomnography report, Dr. Sarrigiannidis identified a sleep disorder, primarily non-hypercapnic central sleep apnea. Central sleep apnea is characterized by a lack of drive to breathe during sleep, or lack of respiratory effort, which results in insufficient ventilation. See Docket No. 18. If, as in Hart's case, there is no specific etiology causing the problem, it is "idiopathic central sleep apnea." Id. Recommendations for treatment generally include the use of a continuous positive air pressure (CPAP) machine or extra oxygen supplied while sleeping. Because excess weight can cause or exacerbate sleep apnea, patients are advised to lose weight.

Dr. Sarrigiannidis' recommended treatment was a one month trial of a nasal CPAP machine, and possibly low flow oxygen. See Docket No. 18, p. 29. Dr. Sarrigiannidis also recommended that if Hart did not improve after a month-long trial with the CPAP, he should repeat the sleep study. Hart was also prescribed inhalers for his complaint of shortness of breath during waking hours.

A CPAP setup was scheduled with Great Plains Rehabilitation Services on July 24, 2006. See Docket No. 18, p. 37. Hart was sent to the appointment with a CPAP machine from the North Dakota State Penitentiary so that the machine could be set for him. The technician's report states that Hart indicated he was "very claustrophobic" and did not think he would be able to use either the full face mask or the nasal mask. Id. The report indicated that, after a trial, Hart could not tolerate either mask. The technician recommended that Hart be desensitized to a CPAP mask, but Hart declined an offer to become desensitized.

Despite his continued housing in the East Cell House, after the July 24, 2006 CPAP fitting, Hart has not again raised with Dr. Hagan the issue of relocation because of sleep apnea. On January 12, 2007, Dr. Hagan saw Hart for bronchitis. In response to an inquiry from Dr. Hagan, Hart reported that he was not treating the central sleep apnea. See Affidavit of Dr. Hagan, Docket No. 18. On June 25, 2007, Dr. Hagan performed an annual physical on Hart, and in response to an inquiry from Dr. Hagan, Hart reported that he had stopped using the prescribed inhalers because they were not effective for him. Hart reported that "he is doing fair but has better and worse days in regards to his breathing." Id. Dr. Hagan offered to refit Hart for a CPAP, but Hart refused, again citing claustrophobia. At the end of August 2007, Hart asked to resume using the inhalers, which were re-prescribed to him. Id. at p. 42.

In addition to Hart's complaint that his medical condition requires a transfer out of any cell house that utilizes steam heat, Hart has complained that he has not received a medical alert button. Hart contends that a medical alert button was ordered by the North Dakota State Penitentiary's physician, Dr. Diehl, in 2002-2003. See Affidavit of William Hart, Docket No. 21-2, p. 3. Dr. Hagan, Hart's treating physician at the penitentiary, states that he has "never received a recommendation from any of the medical consultants to whom Hart was referred [that] he be provided with a medical alert button in his cell." See Affidavit of Dr. Hagan, Docket No. 18, ¶ 23. Dr. Hagan contends that "it would be inconsistent to recommend such a button for [Hart's] central sleep apnea as the sleep apnea occurs when he is asleep; when he wakes he does not suffer apneic episodes." Id.

The North Dakota State Penitentiary utilizes a closed steam heating system in both the East Cell House and the South Unit. See Affidavit of Tim Schuetzle, Docket No. 17, ¶ 9. In the East

5

Cell House, water is heated in the boiler to create steam. Steam is pumped into the radiators, condenses into water, and drains back through the pipes to the boiler where it is reheated. Fresh air from outside the building is drawn into the unit where it is heated or cooled before being released into the cell house, thereby providing the same humidity as the outside air. No steam is vented into the air, and the system adds no humidity to the ambient air. In the South Unit, the steam is pumped through coils over which air is forced. The air becomes heated and moves through air ducts into the cell house. No steam is released into the air in the South Unit, and outside ambient air is also included in the air that is circulated in the cell house.

## II.     STANDARD OF REVIEW

It is well-established that summary judgment is appropriate when the evidence, viewed in a light most favorable to the non-moving party, demonstrates that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Clark v. Kellogg Co., 205 F.3d 1079, 1082 (8th Cir. 2000). A fact is "material" if it might effect the outcome of the case and a factual dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The basic inquiry for purposes of summary judgment is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law. Quick v. Donaldson Co., 90 F.3d 1372, 1376 (8th Cir. 1996). The moving party has the initial burden of demonstrating to the Court that there are no genuine issues of material fact. If the moving party has met this burden, the non-moving party cannot simply rest

on the mere denials or allegations in the pleadings. Instead, the non-moving party must set forth specific facts showing that there are genuine issues for trial. Fed. R. Civ. P. 56(e); Krein v. DBA Corp., 327 F.3d 723, 726 (8th Cir. 2003). A mere trace of evidence supporting the non-movant's position is insufficient. A non-movant must present more than a scintilla of evidence and must present specific facts to create a genuine issue of material fact for trial. F.D.I.C. v. Bell, 106 F.3d 258, 263 (8th Cir.1997). The facts must generate evidence from which a jury could reasonably find for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).

### III.  LEGAL DISCUSSION

"The Eighth Amendment scrutinizes the conditions under which prison inmates are confined in order to prevent the inhumane treatment of inmates." Robinson v. Hager, 292 F.3d 560, 563 (8th Cir. 2002) (citing Farmer v. Brennan, 511 U.S. 825, 832 (1994)). The government is obligated "to provide medical care for those whom it is punishing by incarceration. An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met." Id. (quoting Estelle v. Gamble, 429 U.S. 97, 103 (1976)). "For this reason, the Eighth Amendment proscribes deliberate indifference to the serious medical needs of prisoners." Id.; see Camberos v. Branstad, 73 F.3d 174, 175 (8th Cir. 1995) (requiring an inmate to demonstrate a deliberate indifference to his serious medical needs when alleging a deprivation of medical care). A serious medical need is "one that has been diagnosed by a physician as requiring treatment or one that is so obvious that even a lay person would easily recognize the need for a doctor's attention." Camberos v. Branstad, 73 F.3d 174, 176 (8th Cir. 1995). Deliberate indifference to such a need may be "manifested by prison doctors in their response to the prisoner's needs or by prison guards in

7

intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." Robinson v. Hager, 292 F.3d 560, 563-64 (quoting Estelle v. Gamble, 429 U.S. 97, 103 (1976)).

It is well-established that a prisoner alleging an Eighth Amendment violation must prove both an objective and subjective element. See Wilson v. Seiter, 501 U.S. 294, 298 (1991). The defendant's conduct must objectively rise to the level of a constitutional violation by depriving the plaintiff of the "minimal civilized measure of life's necessities." Rhodes v. Chapman, 452 U.S. 337, 342 (1981). The defendant's conduct must also reflect a subjective state of mind evincing deliberate indifference to the health or safety of the prisoner. Estelle v. Gamble, 429 U.S. 97, 104 (1977). To establish deliberate indifference, the plaintiff must show the defendant was substantially aware of but disregarded an excessive risk to inmate health or safety. Farmer v. Brennan, 511 U.S. 825, 835 (1994).

To prevail on an Eighth Amendment claim of deliberate indifference, an inmate must prove that (1) a substantial risk of serious harm to the inmate existed and (2) the prison official knew of and disregarded that risk. See Robinson v. Hager, 292 F.3d 560, 564 (8th Cir. 2002); Coleman v. Rahija, 114 F.3d 778, 784 (8th Cir. 1997); Choate v. Lockhart, 7 F.3d 1370, 1373 (8th Cir. 1993). This entails a showing of something more than mere negligence or medical malpractice. Roberson v. Bradshaw, 198 F.3d 645 (8th Cir. 1999) (finding that neither negligence nor medical malpractice are sufficient to rise to an Eighth Amendment violation). A claim of deliberate indifference to an inmate's serious medical needs requires that the plaintiff meet a higher burden of proof than is required in a simple negligence claim. A plaintiff-inmate "must clear a substantial evidentiary threshold to show that the prison's medical staff deliberately disregarded the inmate's needs by

8

administering an inadequate treatment." Meuir v. Greene County Jail Employees, 487 F.3d 1115, 1118 (8th Cir. 2007). In addition, an inmate's "mere disagreement with the course of his medical treatment" fails to state a claim of deliberate indifference. Smith v. Marcantonio, 910 F.2d 500, 502 (8th Cir. 1990); see also Dulany v. Carnahan, 132 F.3d 1234, 1239-44 (8th Cir. 1997).

The Count has reviewed the entire record and finds that Hart's claims regarding a failure to transfer to another housing unit and a failure to provide a medical alert button fail as a matter of law. Even assuming that Hart's diagnosis of central sleep apnea presented an objectively serious medical need, Hart has failed to present any evidence which reflects a subjective state of mind evincing deliberate indifference on the part of the defendants. Therefore, Hart's claims of Eighth Amendment violations fail as a matter of law.

The record clearly reveals that Hart has been subjected to a multitude of physical examinations and diagnostic tests in an effort to diagnose the cause of his breathing complaints. From the time Hart was seen on January 31, 2006, for complaints of shortness of breath, Dr. Hagan was proactive in attempting to determine the cause and to rule out any serious medical problems. After not being able to determine the cause of Hart's shortness of breath after a physical examination, Dr. Hagan began medications for chest pain, ordered various chemical tests, as well as a CT scan of the heart, a holter monitor for 24 hours to continuously monitor Hart's heart, and a stress test. When these tests revealed no heart-related cause for Hart's shortness of breath, Dr. Hagan began testing to determine whether the symptoms were caused by a pulmonary disorder. The tests included pulmonary function testing and a consultation with a pulmonologist, Dr. Sarrigiannidis.

Based on Dr. Sarrigiannidis' recommendation, a 24-hour sleep study was conducted on Hart. From the sleep study results, Dr. Sarrigiannidis diagnosed Hart as having central sleep apnea and recommended that Hart be provided a nasal CPAP for a one-month trial, and also noted low flow oxygen administration "can improve the central apneic events. See Docket No. 18. Dr. Sarrigiannidis made no reference to any humidity requirements, but did recommend to Dr. Hagan "about avoiding steam heat." Id. at 35. Dr. Sarrigiannidis does not identify what he means by steam heat nor what effect exposure to steam heat would have on Hart's central sleep apnea condition. Dr. Hagan reviewed the literature on central sleep apnea and did not find any reference to avoiding any particular type of air humidity. See Affidavit of Dr. Hagan, Docket No. 18, ¶ 16. Based on his review and the absence of a difference between the heating systems in the South Unit and the East Cell House, Dr. Hagan found no medical or factual basis to support Dr. Sarrigiannidis' recommendation that Hart avoid steam heat.

Hart has failed to follow through with the recommended treatments of both Dr. Hagan and Dr. Sarrigiannidis. Hart has not lost significant weight, has refused to use CPAP equipment, and has refused later offers to refit and try different CPAP techniques including being desensitized to the CPAP machine to overcome his claustrophobia. Id. at ¶ 21. Hart also discontinued, for a period, the use of the inhalers recommended by his pulmonologist.

Further, Hart has not provided any evidence that there was a medical recommendation for him to have access to a medical alert button. Although Hart contends that Dr. Diehl ordered a medical alert button for him in 2002-2003, Dr. Hagan (Hart's current treating physician) states that he has never received a recommendation that Hart be provided with a medical alert button and that it would be inconsistent to recommend such a button for Hart's sleep apnea.

10

Hart has produced no expert witness testimony nor documentary evidence to support his claim that the failure to transfer him to a non-steam heated cell and failure to provide a medical alert button was constitutionally inadequate. See Meuir v. Greene County Jail Employees, 487 F.3d 1115, 1118 (8th Cir. 2007). It is clear that "[i]n the face of medical records indicating that treatment was provided and physician affidavits indicating that the care provided was adequate, an inmate cannot create a question of fact by merely stating that [he] did not feel [he] received adequate treatment." Id.

There is no evidence in the record before the Court to show that the Defendants ignored Hart's complaints or concerns. Further, there is no evidence in the record to show that the Defendants were deliberately indifferent to Hart's medical needs, or that the Defendants were negligent or in any manner medically mishandled Hart's care. Rather, the record clearly establishes that the Defendants promptly sought a diagnosis and treatment for the ailments of which Hart complained. The mere fact that an inmate disagrees with the course of treatment does not, in and of itself, suffice to establish a violation of the Eighth Amendment. The United States Supreme Court has defined deliberate indifference as something more than negligence. There is simply no evidence in the record before the Court to support a claim of negligence much less any evidence reflecting a deliberate indifference to Hart's medical needs. See Farmer v. Brennan, 511 U.S. 825, 835 (1994). To the contrary, the record before the Court clearly shows that the Defendants were attentive and thorough in the medical care and treatment rendered to date.

**IV.     CONCLUSION**

The Court has carefully and thoroughly reviewed the entire record.  There has been no competent, reliable evidence presented to support the claims of constitutional violations.  There are no genuine issues of material fact for trial and, as such, the Defendants are entitled to summary judgment as a matter of law.  The Defendant's Motion for Summary Judgment (Docket No. 15) is **GRANTED**.  The Clerk of Court shall enter judgment accordingly.

**IT IS SO ORDERED.**

Dated this 7th day of January, 2008.

*/s/ Daniel L. Hovland*
Daniel L. Hovland, Chief Judge
United States District Court